(No. 78932.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MARILYN MULERO, Appellant.

*Opinion filed May 22, 1997.*

Theodore A. Gottfried, State Appellate Defender, Charles M. Schiedel, Deputy Defender, and John J. Hanlon, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield,

448

and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BILANDIC delivered the opinion of the court:

Defendant, Marilyn Mulero, was charged by indictment in Cook County with four counts of murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 1992)), two counts of conspiracy to commit murder (720 ILCS 5/8—2, 9—1 (West 1992)) and one count of unlawful use of a firearm by a felon (720 ILCS 5/24—1.1(a) (West 1992)), arising out of the May 12, 1992, shooting deaths of Jimmy Cruz and Hector Reyes. Defendant subsequently pled guilty to the four counts of murder. The trial court accepted defendant's guilty pleas and entered findings of guilt on all four counts of murder. Finding that certain counts merged with others, the trial court entered judgment on two counts of intentional murder.

Defendant requested a jury for her capital sentencing hearing. The jury found defendant eligible for the death penalty based upon two statutory aggravating factors (720 ILCS 5/9—1(b)(3), (b)(11) (West 1992)). After considering the evidence in aggravation and mitigation, the jury found that there were no mitigating factors sufficient to preclude imposition of the death penalty. Accordingly, the trial judge sentenced defendant to death. Defendant's death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a).

For the reasons that follow, we affirm defendant's convictions for murder but vacate defendant's sentence of death and remand for a new sentencing hearing.

FACTS

On May 12, 1992, Jimmy Cruz and Hector Reyes

were murdered in Humboldt Park, in Chicago, Illinois, at approximately 12:15 a.m. Defendant, who was 21 years of age, was arrested on May 13, 1992. On May 14, 1992, defendant gave a court-reported statement to the police and an assistant State's Attorney. After waiving her *Miranda* rights, defendant was asked about the events that occurred on May 12, 1992. In her statement, defendant indicated that she belonged to the Maniac Latin Disciples gang. Defendant stated that on May 11, 1992, she, Jacqueline Montanez and Madeline Mendoza, who were 15 and 16 years of age respectively, decided to shoot some members of the Latin Kings, a rival gang. The shootings were to avenge the death of a friend named Mudo, who was killed by some Latin Kings a couple of days earlier. Defendant stated that she obtained a small silver automatic gun to carry out the shootings. Defendant borrowed her brother's car and drove Montanez and Mendoza to look for some Latin Kings. They encountered Cruz and Reyes, who were Latin Kings, in another car. The three women and the victims all agreed to go to Humboldt Park. Defendant stated that she intended to kill Cruz and Reyes in the park. At the park, the group walked to the area of a public bathroom. According to defendant, Montanez went into the bathroom and shot Reyes, with the gun defendant had provided, while defendant remained outside. Montanez left the bathroom and gave defendant the gun. Defendant then shot Cruz in the back of the head. Defendant, Montanez and Mendoza then drove away. Both victims died of the gunshot wounds.

On June 19, 1992, defendant was charged with the murders and conspiracy to commit the murders. Montanez and Mendoza were also charged with multiple counts of murder and conspiracy to commit the murders.

On February 26, 1993, defendant filed a motion to suppress her May 14, 1992, statement to the police. In

her motion to suppress, defendant alleged the following: (1) she was not properly informed of her rights pursuant to *Miranda*; (2) she did not understand those rights; (3) she was not provided with an attorney after requesting to speak with one; and (4) the police psychologically coerced her into making a statement. At the suppression hearing, defendant testified that, after she was arrested and asked what happened in Humboldt Park, she told the police she did not know anything about the murders. Defendant further testified that she confessed to the crimes only after the police "coerced" her to do so. After considering all the evidence presented at the suppression hearing, the trial court denied the motion.

On September 27, 1993, defendant entered a plea of guilty for the murders of Jimmy Cruz and Hector Reyes. After the trial court admonished defendant, it accepted the plea as voluntary, knowing and intelligent. The trial court entered a judgment of guilty of two counts of intentional murder. The case then proceeded to a capital sentencing hearing before a jury.

The State presented the following testimony at the eligibility phase. John Dolan, a Chicago police detective, testified that he was dispatched to Humboldt Park on May 12, 1992, to respond to a report of a shooting. Once in Humboldt Park, he found Cruz and Reyes shot to death. Detective Dolan observed Cruz lying on the sidewalk with a .25-caliber cartridge casing lying within two feet of his body. Reyes was lying on the floor of a restroom and a bullet was located three feet from his head.

Dr. Nancy Jones, a forensic pathologist and assistant medical examiner for Cook County, testified that Jimmy Cruz, a 22-year-old male, and Hector Reyes, a 21-year-old male, both died as a result of gunshot wounds to the back of the head. Dr. Jones determined that Reyes was killed by a bullet that entered the center part of the back of his head and exited through his left

eyelid. Given the shape of the entrance wound, she opined that the muzzle of the gun was held directly in contact with Reyes' head at the time the bullet was fired. With respect to Cruz, Dr. Jones found that he was killed by a bullet that entered the lower part of the back of his head. According to Dr. Jones, the gun was probably held within one or two inches of Cruz's head at the time it was fired.

Ivette Rodriguez testified about events occurring before and after the murders of Cruz and Reyes. On May 11, 1992, at about 11 or 11:30 p.m., Rodriguez saw defendant driving a white car with Montanez and Mendoza inside the car. According to Rodriguez, they invited her to go "make a hit with them and roll on some flakes," which meant to kill or fight a rival gang, namely, the Latin Kings. She refused. Approximately 90 minutes later, Rodriguez again saw defendant, Montanez and Mendoza in the neighborhood. Rodriguez testified that defendant told her "we got 'em, we got 'em ... we got the Kings." When Rodriguez called defendant a liar, Montanez pointed to the back of her head and said "yeah we did ... I shot him in the back of the head." Late in the evening on May 12, 1992, Rodriguez informed the police about the murders following her arrest for possession of a controlled substance. On May 13, 1992, Rodriguez accompanied the police in an undercover surveillance of a funeral home, where defendant, Montanez and Mendoza were attending a wake for Mudo. Rodriguez identified defendant and Montanez. The police then arrested defendant and Montanez.

Detective Ernest Halvorsen testified about the events after defendant's arrest. Detective Halvorsen stated that he took part in the arrest of defendant and Montanez after Rodriguez identified them. Mendoza was arrested two days later. After arriving at the police station, Detective Halvorsen placed Montanez and defen-

dant in separate interview rooms. Following his interview with Montanez, he gave defendant *Miranda* warnings. Defendant indicated that she understood her rights and agreed to speak with him. During their conversation, Detective Halvorsen told defendant that she was under arrest for the murders of Cruz and Reyes, who were killed in Humboldt Park. Initially, defendant denied knowing anything about the murders. The detective then informed defendant that Montanez gave a complete statement of what occurred in Humboldt Park, including defendant's involvement. Defendant then agreed to give a statement.

According to Detective Halvorsen, defendant told him that she was a member of the Maniac Latin Disciples street gang. Defendant, Montanez and Mendoza had talked about obtaining revenge against the Latin Kings for murdering their friend Mudo. They decided to "go on a mission ... and shoot some Kings." Defendant obtained a small silver automatic pistol and borrowed a white car from her brother. Defendant, along with Montanez and Mendoza, then drove over to the Latin Kings neighborhood for the purpose of shooting any Latin King they saw on the street. As they were driving, a car pulled alongside of them that contained two men, Cruz and Reyes. Defendant informed Detective Halvorsen that Montanez told her the two men were "flakes," that is, Latin Kings. Defendant, Montanez and Mendoza invited Cruz and Reyes to "party" in Humboldt Park. Defendant told Detective Halvorsen that they knew they were going to kill Cruz and Reyes when they arrived at the park. Once in the park, Montanez walked into a bathroom with Reyes and shot him in the back of the head. Montanez then handed the gun to defendant. Defendant walked up behind Cruz and shot him in the back of the head. The three girls then went back to their neighborhood. Detective Halvorsen de-

scribed defendant's demeanor at the time of her statement as arrogant and cocky. According to Detective Halvorsen, defendant was proud of herself because she had performed a mission for her "nation." In Detective Halvorsen's opinion, defendant did not appear remorseful during her conversations with him.

John Dillon, an assistant State's Attorney for Cook County, testified that when he arrived at the police station on May 14, 1992, he first spoke with Montanez, who gave a court-reported statement. Next, Assistant State's Attorney Dillon spoke with defendant after advising her of *Miranda* warnings, which she claimed to understand and waived. Defendant agreed to give a court-reported statement. During defendant's oral statement, she indicated that there was a celebration after the murders. Assistant State's Attorney Dillon stated that defendant's demeanor during their conversation was very calm. Defendant was in control of herself and did not indicate any remorse for her actions. It appeared to Assistant State's Attorney Dillon that defendant was very proud of what she had done.

The State concluded its case at the eligibility phase by presenting evidence by stipulation. It was stipulated that James Tracy, a firearms examiner with the Chicago police department crime laboratory, would testify that the bullet taken from Cruz's body and the bullet found next to Reyes' body were .25-caliber bullets, and that the cartridge casing found near Cruz's body was a .25-caliber cartridge. Also admitted into evidence was a certified copy of defendant's indictment and conviction following her guilty plea. The State then rested. The defense presented no evidence at the eligibility phase.

After considering the evidence, the jury found beyond a reasonable doubt that defendant was eligible for the death penalty under the following aggravating factors: (1) the murder was committed in a cold, calculated,

and premeditated manner pursuant to a preconceived plan (720 ILCS 5/9—1(b)(11) (West 1992)) and (2) defendant had been convicted of murdering two or more persons (720 ILCS 5/9—1(b)(3) (West 1992)).

In the second phase of the sentencing hearing, the State presented the following evidence in aggravation. David Lavin and Sandra Stavropoulos, Cook County assistant State's Attorneys, testified regarding their previous prosecutions of defendant. Lavin stated that defendant pled guilty on March 28, 1990, to two charges of delivery of a controlled substance. Defendant received two years' probation and served 30 days in the county jail. On March 2, 1991, while on probation, defendant was arrested for selling cocaine to an undercover officer. Stavropoulos stated that on July 1, 1991, defendant pled guilty to delivery of a controlled substance and received a three-year prison term. Defendant was paroled on February 28, 1992.

Joanne Roberts testified for the State about her encounters with defendant in jail. On March 27, 1993, Roberts had been arrested for armed robbery. While Roberts was in Cook County jail, she met defendant, who she knew was a Maniac Latin Disciple. Roberts stated that in June of 1993, while in jail together, defendant asked her to kill Jackie Montanez because she was going to testify against her. When Roberts refused, defendant informed her that "she would take care of it herself." After relaying this information to the prosecutors, Roberts was released from jail and placed on an electronic home monitoring system for her own safety. According to Roberts, no promises were made to her regarding her pending charges in exchange for her testimony. Roberts then testified about threatening phone calls she received from defendant and an unknown male member of the Maniac Latin Disciples prior to her testimony at this sentencing hearing.

Finally, Anthony Riccio, a detective for the Chicago police department, who at the time of the murder was assigned to the gang crimes unit and was familiar with the street gangs in the Humboldt Park area, testified for the State. Detective Riccio explained a news videotape taken of defendant after she confessed to the murders. Detective Riccio testified that as he escorted defendant through the police station after her confession, television news cameras captured her shouting gang slogans and flashing gang signals with her hands. As the videotape was played to the jury, Detective Riccio explained that defendant took her hand and placed it over her heart, which meant that what she was about to say and do was "from her heart." Next, defendant's hand was shown pointing five fingers downward, which represented a disrespectful gesture to the Latin Kings. Defendant then flipped her hand in an upright position, like a pitchfork, to show her allegiance to the Maniac Latin Disciples. Defendant also stated "KK," which Detective Riccio stated meant "king killers" and was a form of disrespect to the Latin Kings.

Following Detective Riccio's testimony, the State concluded the aggravation portion of the sentencing hearing. Defendant presented the following evidence in mitigation. Four individuals who testified on behalf of defendant were persons she had encountered while in Cook County jail. Joseph Widdington, a teacher in the PACE program (Program Active for Correctional Education), testified that defendant was a tutor in this program. Widdington described defendant as a quiet person who wrote poetry. In Widdington's opinion, defendant was the type of person who had talent but never used it. Gloria Brookins, a social worker and counselor for the PACE program, testified that defendant helped her with other women with respect to peer tutoring, organizing socials and monthly activities. Brookins

stated that she never saw defendant threaten anyone in the program. Rather, defendant was friendly and well liked. Sergeant Sharon Smith, a correctional officer in Cook County jail, stated that defendant was a quiet, nice, respectful, and affable person. She never witnessed defendant engage in gang-related behavior. According to Sergeant Smith, defendant had an easygoing disposition and a positive attitude. Martin Lowery, another correctional officer, testified that there were no threats or disturbances between defendant and Montanez.

Defendant's mother, Angelina Gonzalez, also testified on behalf of defendant. Mrs. Gonzalez stated that she brought defendant's two children to visit her in jail every week. According to Mrs. Gonzalez, defendant behaved well with her children and frequently called to ask about them.

Defendant herself testified in the mitigation stage of the sentencing hearing. Defendant stated that she was a former member of the Maniac Latin Disciples. Defendant recounted that in 1992 she did not hate the Latin Kings because she never had any problems with them. Defendant testified, however, that she became angry about the murder of Mudo, a deaf mute from her neighborhood. Defendant stated that because of Mudo's death she agreed to join Jackie Montanez and Madeline Mendoza to kill some Latin Kings. According to defendant, Montanez obtained a .25-caliber automatic gun, while defendant borrowed her brother's car and drove Montanez and Mendoza to look for some Latin Kings. They eventually encountered Jimmy Cruz and Hector Reyes, who asked the girls to meet them in Humboldt Park. Montanez informed defendant that Cruz and Reyes were Latin Kings. Defendant stated that, although she knew Montanez had a loaded gun, she did not know that Montanez would shoot Reyes. After Reyes' shooting, Montanez handed defendant the gun

and she placed the gun approximately five inches away from Cruz's head and shot him. According to defendant, she began to cry after she shot Cruz. Defendant then admitted going back to the neighborhood along with Montanez and Mendoza and bragging to Ivette Rodriguez about what they had just done.

During defendant's testimony, she also admitted knowing Joanne Roberts in Cook County jail. According to defendant, however, she had little conversation with Roberts. Defendant denied asking Roberts to have Montanez killed. Defendant refuted Roberts' allegation that she was mad at Montanez. Defendant also acknowledged that she obtained Roberts' telephone number from Roberts, who gave it to her so they could keep in touch. Defendant stated that she called Roberts once and asked her how she was doing and how she was able to go on an electric home monitoring system. Roberts informed defendant that the State made a deal with her in exchange for her turning State's evidence against Mendoza.

Additional facts are discussed where relevant in the analysis portion of the opinion.

After considering the evidence in aggravation and mitigation, the jury unanimously found that there were no mitigating factors sufficient to preclude a sentence of death. The trial court accordingly sentenced defendant to death.

Defendant subsequently filed post-sentencing motions. After a hearing, defendant's motion for a new sentencing hearing was denied. Defendant then filed a *pro se* petition to withdraw her guilty plea and vacate her sentence, and a *pro se* motion for modification of sentence. Defense counsel later filed a supplemental motion for a new sentencing hearing, and a supplemental petition to withdraw defendant's guilty plea and vacate her sentence. The court refused to accept the filing of

the new sentencing hearing motion. With respect to the supplemental petition to withdraw defendant's guilty plea and vacate her sentence, the court confined the evidence to whether defendant's guilty plea had been knowing, intelligent and voluntary. After a hearing, the court denied the motion to withdraw defendant's guilty plea. This appeal followed.

## ANALYSIS

Defendant raises the following issues on appeal: (1) whether the prosecutor's questions during cross-examination and remarks during closing arguments at the sentencing hearing concerning defendant's filing of a pretrial motion to suppress her confession deprived defendant of her right against self-incrimination and to due process of law; (2) whether the trial court erred in admitting as evidence in aggravation the testimony of Joanne Roberts regarding death threats made to her by an unknown man; (3) whether the trial court erred in refusing to allow the defense to bring defendant's two young children before the jury for them to view during the presentation of mitigating evidence; (4) whether defendant's death sentence must be vacated because of the prosecutor's remarks during closing arguments at the sentencing hearing; (5) whether the trial court erred in ruling that the testimony of the defense's clinical psychologist at the post-sentencing hearing was not credible; (6) whether the trial court erred in allowing defendant only 10 peremptory challenges in selecting the sentencing jury; (7) whether section 9—1(b)(11) of the Criminal Code of 1961 is an unconstitutional eligibility factor; and (8) whether the Illinois death penalty statute is unconstitutional. For the reasons stated below, we vacate defendant's death sentence and remand for a new sentencing hearing.

# I. SENTENCING ISSUES

## A. Reference to Defendant's Motion to Suppress

Defendant argues that she was deprived of due process of law and her fifth amendment right against self-incrimination at the aggravation/mitigation stage of her capital sentencing hearing. Defendant claims that the prosecutor improperly cross-examined defendant by questioning her about her pretrial motion to suppress her confession and its subsequent denial. Defendant also contends that the prosecutor made improper comments during closing arguments about the motion to suppress. We agree that the prosecutor's use of defendant's motion to suppress at the sentencing hearing was improper and prejudicial and entitles defendant to a new sentencing hearing.

As noted, defendant filed a pretrial motion to suppress her confession on the bases that she was not timely given *Miranda* warnings and was coerced by the police into making a statement. The trial court denied the motion to suppress, after which defendant entered a plea of guilty. At the second phase of the sentencing hearing, defendant's theory of mitigation was that she entered her plea of guilty because of remorse. Defendant testified in mitigation that she pled guilty because she knew her actions were wrong and she wanted to ease her conscience. On cross-examination, the prosecutor asked defendant if she knew the meaning of the word remorse and if she had ever felt remorse about this case. Defendant responded that feeling remorse meant "feeling sorry," and that she had felt remorse ever since the murders happened. Defendant also stated that she had cooperated with the police and told the truth since the murders happened. The prosecutor then confronted defendant with her testimony from the pretrial suppression hearing, at which defendant admitted initially telling the police that she did not know what happened in

Humboldt Park. The prosecutor continued his cross-examination of defendant as follows:

"Q. [Assistant State's Attorney:] When did you first decide that you were going to plead guilty on this case?

A. Months ago, before Jackie came to trial.

Q. Pardon me?

A. Months ago before Jackie started her trial.

Q. Well, about what month in particular did you first start thinking you were going to plead guilty here?

A. Around June or July.

Q. June or July. Well, was it before—do we have—was it before you had the pretrial hearing with Judge Mannion?

A. After the pretrial hearing.

Q. After. That's because in that hearing before Judge Mannion, you know, when you had all this remorse in your heart and everything else, you tried to get the Judge to throw out your confession, isn't that correct?

A. No.

MR. LYNCH [defense attorney:] Objection. Judge, may I have a sidebar?

THE COURT: Overruled.

* * *

Q. [Assistant State's Attorney:] Miss Mulero, you testified that you decided or you were starting to think about pleading guilty sometime in June of 1993, isn't that correct?·

A. Yes.

Q. And also coincidentally right around that time, there was a hearing on a motion that you and your attorney filed to have your confession thrown out of court, isn't that correct?

A. Yes.

Q. And in fact showing you what is People's Exhibit Number 51, here's a copy of a motion that was filed on your behalf, isn't that correct?

A. Yes.

Q. And in facts [sic] in June of 1993, you stood and took an oath before the clerk saying that all the allegations in that motion were correct, isn't that right?

A. Yes.

Q. And in this motion, you said basically that you didn't get your rights read to you, is that correct?

A. Yes.

Q. And you also said basically that the police tricked you into confessing, isn't that correct?

A. In some way, yes.

Q. And there was a hearing on that matter, and your motion was thrown out of court, isn't that correct?

A. I don't know.

Q. Well, you know then that your confession would be admissible in your case if you went to trial, isn't that correct?

A. What [do] you mean by admissible?

Q. Well, you knew that the People of the State of Illinois could use that confession that you have in front of you if you went to trial, isn't that correct?

A. Yes.

Q. And you found that out in June of 1993, isn't that correct?

A. Yes.

Q. Right around the time you start[ed] thinking about pleading guilty, isn't that correct?

A. Yes."

The prosecutor also referred to defendant's failed suppression motion during closing and rebuttal arguments at the aggravation/mitigation phase. The prosecutor characterized the motion to suppress as a "legal maneuver" and argued that it demonstrated defendant's lack of remorse. More specifically, the prosecutor made the following remarks to the jury at the sentencing hearing:

"If she wanted to plead guilty, she could have come in court. And you saw the indictment when she was indicted back in the spring of 1992. She could have come to court and pled guilty. But no, she tried some legal maneuver to try to get her confession thrown out of court. That didn't work, she saw what happened to her co-defendants, that didn't work. You figure out why she pled guilty. She is cutting her losses. What else is she going to do. Is that mitigation.

* * *

And what are the facts of the guilty plea. The guilty plea is an out and out sham and we know it. She is trying to maneuver her way through the legal system to tell you she is remorseful. You saw her up on the stand when she took the stand. Was she remorseful or was she trying to figure out a way how to get out of this mess she's got herself into. She is trying to beat this case absolutely one hundred percent. She is like a trapped rat in a corner that has no way out.

And how do we know that. We know that because at the time she decides to become remorseful two months ago, she is trying to get the statement thrown out saying the police tricked her, they tricked her. I didn't confess, but yet she tells you I was remorseful. I'm sorry you can't have it both ways, folks.

Mr. Gamboney [Assistant State's Attorney] specifically asked her, you supported the contents of this motion and she swore that the police tried to trick her, and that's why she confessed, not because she was remorseful."

It is well settled that a defendant's remorse or lack thereof is a proper subject for consideration at sentencing. See *People v. Barrow*, 133 Ill. 2d 226, 281 (1989); *People v. Neal*, 111 Ill. 2d 180, 196 (1985). When inquiring into a defendant's remorse, however, the State may not violate a defendant's constitutional rights. See *People v. Szabo*, 94 Ill. 2d 327, 360 (1983). Defendant contends that the State's questions and comments here improperly used defendant's exercise of her constitutional rights against her. See *Griffin v. California*, 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (1965); *Szabo*, 94 Ill. 2d 327. Both the United States Supreme Court and this court have held that comments about a defendant's exercise of a constitutional right are improper because they penalize a defendant for exercising his or her right. See *Griffin*, 380 U.S. at 614, 14 L. Ed. 2d at 109-10, 85 S. Ct. at 1232-33; *Szabo*, 94 Ill. 2d at 360. Such comments have a chilling effect on a defendant's exercise of his or her constitutional right by making as-

sertion of a particular right costly. See *Griffin*, 380 U.S. at 614, 14 L. Ed. 2d at 110, 85 S. Ct. at 1233.

These principles were clearly violated by the prosecutor's questions and comments in this case. During both the cross-examination of defendant and the closing arguments, the prosecutor used defendant's mere filing of the motion to suppress against her in an effort to demonstrate defendant's lack of remorse. The State's use of defendant's motion to suppress in this manner was wholly improper and unquestionably prejudicial.

Undeniably, defendant had a constitutional right to remain silent. U.S. Const., amend. V. In filing the motion to suppress, defendant argued that her fifth amendment right to remain silent had been violated and the motion attempted to vindicate that right. Regardless of whether the motion was successful, defendant nevertheless had the right to challenge her confession on this basis. In using defendant's motion to suppress against her, the prosecutor essentially used defendant's exercise of a constitutional right against her. The sentencing jury was in effect told that it could consider defendant's exercise of her constitutional right to remain silent as an aggravating factor against her. The exercise of a constitutional right may not be turned into a sword to be used against a defendant in this manner. The "chilling effect" on a defendant's decision to exercise a constitutional right in circumstances such as those in this case is obvious. This court has condemned a similar practice by the State in *People v. Szabo*, 94 Ill. 2d 327 (1983).

In *Szabo*, the defendant chose to remain silent following his arrest. The defendant testified in mitigation at the aggravation/mitigation phase of his capital sentencing hearing that he felt bad about the murders. In response to his mitigation testimony, the prosecutor cross-examined the defendant about his failure to make

a statement showing remorse to the police at the time of his arrest. During closing arguments at sentencing, the prosecutor argued that the defendant was not truly remorseful because he had not offered an explanation or statement of contrition following his arrest but chose to remain silent. This court found the prosecutor's questioning and argument constituted plain error. The prosecutor's comments used the defendant's silence to impeach his testimony at sentencing and thereby penalized the defendant for exercising his constitutional right to remain silent. *Szabo*, 94 Ill. 2d at 359-61. Such actions by the prosecutor were held to be fundamentally unfair and to require a new sentencing hearing. *Szabo*, 94 Ill. 2d at 362, 367-68.

The State's comments in this case are equally as egregious as those found to require reversal in *Szabo*. In both cases, the defendant was penalized for exercising a constitutional right. While the defendant in *Szabo* directly exercised the right to remain silent, defendant here indirectly exercised her fifth amendment right to remain silent by attempting to enforce that right in her motion to suppress. As in *Szabo*, we find the prosecutor's questions and remarks regarding defendant's exercise of a constitutional right in this case to be fundamentally unfair and to require that defendant's death sentence be vacated.

The State responds that its questions on cross-examination were proper because it was simply attempting to impeach defendant's credibility regarding her guilty plea with her prior inconsistent testimony at the suppression hearing. See *People v. Hudson*, 157 Ill. 2d 401, 435 (1993) (any permissible kind of impeaching matter may be developed on cross-examination to test the credibility of a witness). According to the State, it was attempting to impeach defendant's mitigation testimony, that remorse was the motive for her guilty plea,

with her prior inconsistent statements from the suppression hearing. We agree with the State's argument *only* to the extent that it was proper to impeach defendant with her prior inconsistent testimony from the suppression hearing.

A defendant's constitutional rights are not violated when a defendant is cross-examined as to a prior inconsistent statement. See *Anderson v. Charles*, 447 U.S. 404, 408-09, 65 L. Ed. 2d 222, 226-27, 100 S. Ct. 2180, 2182 (1980); *People v. Adams*, 109 Ill. 2d 102, 119-20 (1985). It is also well established that a defendant's testimony in conjunction with his or her motion to suppress evidence can be used to impeach a defendant's testimony at trial. See *People v. Sturgis*, 58 Ill. 2d 211, 216 (1974). We adhere to these principles. Here, however, the State exceeded the bounds of simply impeaching defendant with prior inconsistent testimony. Rather, the State used defendant's actual motion to suppress against her by suggesting that its mere filing was itself evidence of a lack of remorse on the part of defendant. A defendant's exercise of a constitutional right is not permissible impeachment evidence. See *Doyle v. Ohio*, 426 U.S. 610, 619, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245 (1976) (violation of due process when defendant's silence following *Miranda* warnings is used to impeach an explanation subsequently offered at trial).

Moreover, the mere filing of the motion to suppress her confession did not contradict defendant's claim that remorse was the motive behind her guilty plea. The motion to suppress had no correlation to defendant's remorse. Defense counsel employed the motion to suppress to address an issue of law, namely, the admissibility of defendant's confession as evidence. Consequently, the prosecutor, in arguing the motion to suppress, introduced evidence that neither involved an inconsistent statement nor was relevant for impeachment

purposes. See *Hudson*, 157 Ill. 2d at 449. As such, the prosecutor here did not merely "utilize the traditional truth-testing devices of the adversary process." *Harris v. New York*, 401 U.S. 222, 225, 28 L. Ed. 2d 1, 4, 91 S. Ct. 643, 645-46 (1971). We therefore reject the State's claim that the filing of the motion to suppress was properly used to impeach defendant's testimony. Under these circumstances, we find that the trial court abused its discretion in allowing cross-examination as to defendant's filing of a motion to suppress. See *Hudson*, 157 Ill. 2d at 435; *People v. Peeples*, 155 Ill. 2d 422, 492 (1993).

With regard to the prosecutor's comments during closing argument, the State first contends that any challenge to those comments has been waived because defendant neither objected to them at trial nor included them in her post-sentencing motion. See *People v. Enoch*, 122 Ill. 2d 176 (1988). As in *Szabo*, however, we find that fundamental fairness requires that the strict waiver rule be relaxed in this case and that the prosecutor's closing arguments be recognized as plain error affecting defendant's substantial rights. See *Szabo*, 94 Ill. 2d at 362; *People v. Green*, 74 Ill. 2d 444, 450 (1979).

Aside from its waiver argument, the State claims that these comments were proper because the prosecutor merely challenged defendant's proclaimed motives for pleading guilty and highlighted evidence showing defendant was not remorseful. In support of its position, the State refers to the general rule that challenging the credibility of a defendant and his or her theory of defense is proper in closing argument when there is evidence justifying the challenge. See *Hudson*, 157 Ill. 2d at 444. Here, according to the State, its challenge to defendant's claim of remorse was justified given defendant's testimony during the suppression hearing. We do not dispute that the prosecutor was permitted to challenge defendant's credibility regarding her motive for

pleading guilty by commenting on defendant's apparent lack of remorse as evidenced by her *testimony* at the suppression hearing. The prosecutor, however, went far beyond that permissible commentary to suggest that defendant's exercise of a constitutional right be used as aggravation evidence against her. The prosecutor's comments were clearly intended to direct the jury's attention to defendant's attempt to enforce her right to silence. See *People v. Franklin*, 135 Ill. 2d 78, 101 (1990); *People v. Burton*, 44 Ill. 2d 53, 55-57 (1969). This improper commentary on defendant's exercise of a constitutional right resulted in substantial prejudice to defendant at the sentencing hearing by casting defendant's assertion of her right in an unfavorable light to the jury.

Based on the foregoing analysis, we hold that defendant's filing of a motion to suppress was irrelevant both substantively and for impeachment purposes at the sentencing hearing. The prosecutor improperly used defendant's constitutional right to silence against her by introducing into evidence her motion to suppress, which was intended to enforce that right. Defendant was prejudiced by the prosecutor's actions and deprived of a fair capital sentencing hearing because the sentencing jury was permitted to rely on improper evidence and comments. Accordingly, we vacate defendant's death sentence and remand for a new sentencing hearing.

Defendant also raises other challenges to her capital sentencing hearing and to the constitutionality of the Illinois death penalty statute. Because we have concluded that defendant is entitled to a new sentencing hearing, we address only those alleged errors which are likely to arise again on remand. See *People v. Simms*, 143 Ill. 2d 154, 173 (1991).

## B. Jury Selection

Defendant contends that she was denied a fair

capital sentencing hearing because the trial court allowed each side only 10 peremptory challenges.

The record reveals that, after defendant requested a jury for the sentencing hearing, the prosecutor informed the trial judge that he thought each side should receive 10 peremptory challenges. The trial judge accepted this representation by the prosecutor and allowed each side 10 peremptory challenges. Defense counsel did not object to the number of peremptory challenges allotted. During the jury selection, defendant used nine peremptory challenges before agreeing on a 12-member jury. Defendant subsequently utilized her last peremptory challenge to exclude one of the two alternate jurors. Defendant now claims that she was entitled to 14 peremptory challenges pursuant to Supreme Court Rule 434(d) (134 Ill. 2d R. 434(d)). Defendant further claims that the trial court committed reversible error in allowing her only 10 peremptory challenges. As a result, defendant asserts that her sentence of death should be vacated and the cause remanded for the proper selection of a sentencing jury.

The State concedes that the trial court erred in allotting defendant only 10 peremptory challenges. We agree. Supreme Court Rule 434(d) provides, in pertinent part, that "[a] defendant tried alone shall be allowed 14 peremptory challenges in a capital case." 134 Ill. 2d R. 434(d). It is thus clear that the trial court erred in this case by allowing defendant only 10 peremptory challenges. See *People v. Daniels*, 172 Ill. 2d 154 (1996). On remand, defendant should be allowed the proper number of peremptory challenges. Because we have already determined that defendant is entitled to a new sentencing hearing on another ground, we need not address whether the trial court's actions as to the number of peremptory challenges amounted to reversible error.

## C. Eligibility

Defendant claims that her death sentence must be

vacated because the jury found her eligible on the basis of an unconstitutionally vague eligibility factor. As set forth in the facts, the sentencing jury found defendant eligible for death on the basis of two eligibility factors: (1) murder of two or more persons (720 ILCS 9—1(b)(3) (West 1992)), and (2) murder committed in a cold, calculated and premeditated manner pursuant to a preconceived plan (720 ILCS 5/9—1(b)(11) (West 1992)). Defendant now challenges the constitutionality of section 9—1(b)(11), arguing that its terms are vague such that a limiting construction should be applied to this factor. Defendant also alleges that section 9—1(b)(11) is unconstitutional because its terms do not narrow the class of individuals eligible for the death penalty.

This court has previously rejected identical challenges to the constitutionality of section 9—1(b)(11). We have held that section 9—1(b)(11)'s terms are not unconstitutionally vague because they provide sufficient guidelines for the sentencer in determining death eligibility. See *People v. Williams*, 173 Ill. 2d 48, 89-90 (1996); *People v. Johnson*, 154 Ill. 2d 356, 372-73 (1993). Consequently, the need for a limiting instruction has been rejected. In addition, we have held that the terms of section 9—1(b)(11) sufficiently narrow the class of eligible defendants by placing the necessary restraint on the sentencer's discretion to impose death. See *People v. Munson*, 171 Ill. 2d 158, 191 (1996). We are not persuaded that we should reconsider these holdings. Therefore, we adhere to our prior decisions that section 9—1(b)(11) is constitutionally valid.

### D. Aggravation

Defendant contends that the trial court erred in allowing the State's witness Joanne Roberts to testify during the aggravation/mitigation phase of the sentencing hearing that she received death threats over the telephone from an unknown male, who warned her not to testify against defendant.

Joanne Roberts testified that she had met defendant while both were incarcerated in Cook County jail. Roberts knew that defendant was a member of the Maniac Latin Disciples street gang. Roberts testified that in June of 1993 she and defendant had a conversation in which defendant stated that her codefendant, Jackie Montanez, was going to "turn states on her." Roberts claimed that defendant then asked her to kill Montanez. Roberts refused and defendant replied that "she would take care of it herself." Roberts subsequently reported her conversation with defendant to prosecutors. On July 29, 1993, Roberts was released from jail and placed on an electronic home monitoring system for her own safety. Roberts testified that in August of 1993, shortly after her release and while at home, she received a phone call from defendant in which defendant asked her why she had turned against her, and told Roberts that she "would be dealt with later on for that." Roberts further testified that she received another phone call about a week prior to her testimony at defendant's death penalty hearing in November of 1993, which she described in the following manner:

"Q. [Assistant State's Attorney:] Directing your attention to approximately last week, did you have occasion again to be contacted by someone from the Disciples?

A. Yes, I did.

Q. And did that person identify himself?

A. He called me from the penitentiary and he said he was—he was one of the—one of the, what do you call them, was one of the ones that call shots over there.

And he said that he was going to have me killed for turning states on them for telling them—for telling on them. And he just went on and on and on.

MR. LYNCH [defense attorney]: Judge, may I have a sidebar?"

Defense counsel objected that evidence of this threat was inadmissible because there was no connection established between it and defendant. The trial court

overruled the objection because defendant's connection to this threat was "a reasonable inference to be drawn from the previous conversations." Roberts then resumed her testimony regarding the phone call:

"Q. Can you tell the ladies and gentlemen of the jury at that time what he said to you?

A. He said that he was—he was one of the chiefs from the Disciples and that if I testified against Muneca [defendant], that he was going to have me killed. And he knew that [sic] where I lived and everything.

And he was just going on and on with the same thing. And I just hung up on him.

Q. Now, during your time in Cook County Jail, did you have occasion to learn whether or not Marilyn Mulero had any rank with her gang inside the jail?

A. Yes, she did.

Q. And what was her rank?

A. She was calling it for the second floor. She had the second floor."

Defendant argues that Roberts' testimony regarding a threat by an unknown male was inadmissible. According to defendant, the evidence was neither relevant nor reliable because the State failed to establish a connection between defendant and the third party's threat. In support of her argument, defendant points out that the evidence failed to show that she had ordered this phone call, or that she even knew of it, or that she had any familiarity with the unidentified male who made the call. Instead, the only connection between defendant and this threat was that the unknown male caller identified himself as a member of the Maniac Latin Disciples, the gang to which defendant belonged. Defendant contends that this connection is insufficient to meet the reliability standard for the admission of evidence at a death sentencing hearing. Moreover, defendant contends that it is not reliable to infer that, because defendant had previously spoken with Roberts, she was responsible for a phone call months later from an unknown man who

made the claim that he would kill her. Because Roberts' testimony as to the third party threat lacked relevance and reliability, defendant concludes that it was improperly admitted. Furthermore, because that testimony concerned the threat to kill a prosecution witness, it was prejudicial to defendant.

It is well established that the evidentiary rules which apply at trial do not apply during the aggravation/mitigation phase of the death penalty hearing. These rules are inapplicable because it is important that the sentencing authority possess the fullest information possible with respect to the defendant's life, character, criminal record and the circumstances of the particular offense. See *People v. Fair*, 159 Ill. 2d 51, 90 (1994); *People v. Brisbon*, 129 Ill. 2d 200, 218-19 (1989). The only requirement regarding admissibility of evidence at this stage is that it be relevant and reliable, the determination of which lies within the sound discretion of the trial judge. See *People v. Williams*, 164 Ill. 2d 1, 27 (1994); see also *Fair*, 159 Ill. 2d at 89; *Brisbon*, 129 Ill. 2d at 218; *People v. Salazar*, 126 Ill. 2d 424, 468 (1988); *People v. Free*, 94 Ill. 2d 378, 422-23 (1983).

After considering Roberts' testimony in light of these principles, we find her testimony to be both relevant and reliable. We first note that any evidence regarding a defendant's character, including proof of prior misconduct that has not resulted in prosecution or conviction, is relevant. See *People v. Patterson*, 154 Ill. 2d 414, 476 (1992); *Salazar*, 126 Ill. 2d at 468. Roberts' testimony was relevant to defendant's character because it showed that defendant was responsible for threatening a prosecution witness. As such, it reflected on defendant's violent character. In addition to being relevant, Roberts' testimony regarding the phone threat was also reliable because a combination of factors establishes a sufficient connection between defendant and the third party's

threat. First, defendant and the third party were both high-ranking members of the Maniac Latin Disciples street gang. Second, the threat specifically named defendant as the one whom Roberts should not testify against. The fact that defendant did not directly make the threat does not make this evidence less reliable given defendant's prior conversations with Roberts. When defendant believed that Montanez was going to turn State's evidence on her, she solicited Roberts to murder Montanez. Following Roberts' refusal, defendant said she would take care of it herself. When defendant learned that Roberts herself turned State's evidence, defendant called Roberts and threatened that she would be "dealt with later." Then, a week before Roberts was to testify at defendant's death penalty hearing, she received a threatening phone call from a Maniac Latin Disciples gang member, who told her that if she testified against defendant he would have her killed. The totality of these circumstances demonstrates a sufficient link between defendant and the last threatening phone call made to Roberts. Roberts' testimony was therefore properly admissible as both relevant and reliable evidence.

Defendant's reliance on our decision in *People v. Lucas*, 151 Ill. 2d 461 (1992), is misplaced. In *Lucas*, the defendant was convicted of the murder of a prison superintendent, a gang-related crime which occurred in retaliation for the death of another member of the defendant's gang. This court found that a correctional officer's testimony regarding gang members' threats of retaliation was improperly admitted. *Lucas*, 151 Ill. 2d at 478. This court relied on the fact that the correctional officer, who testified as to the threats, stated that defendant did not make the threats. *Lucas*, 151 Ill. 2d at 478. Moreover, the court pointed out that the victim's murder was not close in time to the gang member's death, which occurred over two months prior to the murder.

*Lucas*, 151 Ill. 2d at 478. This court also determined that evidence of a gang member's attack upon another correctional officer one day before the murder and a gang member's threat to poison an inmate who was cooperating with the prosecution were inadmissible. *Lucas*, 151 Ill. 2d at 486. We rejected this evidence because there was neither evidence connecting defendant to the attack on the correctional officer nor evidence connecting defendant to the plan to poison the cooperating inmate. *Lucas*, 151 Ill. 2d at 486. While this court found error in the admission of this evidence, this court ultimately determined the error to be harmless. Defendant now contends that our decision in *Lucas* demonstrates that mutual gang membership and mutual gang motivation against a person are insufficient to establish a connection between a defendant and a third party's threats.

This case is distinguishable from *Lucas*. Initially, we note that the evidence in *Lucas* was presented at trial, where strict rules of evidence apply, whereas Roberts' testimony occurred at the capital sentencing hearing, where the rules of evidence are relaxed. More importantly, here there was a prior connection between defendant and the person receiving the threats, namely, Roberts. Although defendant did not make the last threatening phone call, she did have a history of threatening those who crossed her, including Roberts. Consequently, the connection between defendant and the threatening phone call in this case involved more than mutual gang membership and mutual gang motivation. Under the circumstances of this case, we determine that it is reasonable to infer that defendant was the source of the threats against Roberts.

Thus, we hold that the trial court did not abuse its discretion in allowing Roberts to testify about threatening phone calls she received prior to her testimony at defendant's death penalty hearing.

### E. Mitigation

Defendant asserts that the trial court erred in refusing to allow the defense to display defendant's two young children before the jury during its presentation of mitigating evidence.

The record reveals that defendant's mother and defendant testified during the mitigation phase of the sentencing hearing about defendant's relationship with her children. Defendant's mother, Angelina Gonzalez, testified that defendant had two children, Juan Carlos Mulero, age seven, and Mario Canales, age five, who lived with defendant prior to her incarceration. Mrs. Gonzalez stated that she brought the children to visit defendant in jail every week and that defendant exchanged letters with her children. Mrs. Gonzalez also stated that defendant called her children frequently and behaved well with them.

Defendant also testified about her children, who were present in the courtroom and seated with her mother. Defendant stated that she was 15 years of age when she had Juan Carlos and 17 years of age when she had Mario. According to defendant, she raised her children on her own by working at two jobs. Defendant told the jury that if she did not get the death penalty she would have a better relationship with her kids and would be a better mother. She explained that, even if she should be incarcerated forever, she could still be a mother to her children by having them visit her in prison. Defendant further explained that she did not want her children to testify because she did not want them "to ever grow up noticing that they went through this trauma." However, defendant stated that she would not mind if her children were brought before the jury.

The trial court refused defense counsel's request to have the children displayed to the jurors. The court found such evidence to be improper because it was "an obvious attempt to evoke sympathy" on behalf of defen-

dant to the jury. Moreover, the court noted that such a display of the children was unnecessary because there had already been testimony about defendant's children, and the jury was aware they were in court.

Defendant now challenges the court's ruling on the basis that it was an improper infringement upon her right to present mitigating evidence. Defendant claims that the physical display of her children to the jury was proper mitigating evidence because it would demonstrate the most positive aspect of defendant's character, namely, her two children. According to defendant, it was necessary for the jury to view any positive visible aspects of the children's development, which could then be attributable to defendant, who alone raised them. In essence, defendant contends that her children represented physical evidence, which was necessary to explain testimonial evidence.

As previously stated, during the aggravation/ mitigation phase of a capital sentencing hearing, the rules of evidence are relaxed and evidence need only be relevant and reliable to be admissible. See *People v. Brown*, 172 Ill. 2d 1, 49 (1996); *Patterson*, 154 Ill. 2d at 475. The determination of evidence's admissibility at the second phase of the sentencing hearing lies within the sound discretion of the trial judge. See *Brown*, 172 Ill. 2d at 49; *Patterson*, 154 Ill. 2d at 475.

With these principles in mind, we find that the trial court in the instant case did not abuse its discretion in denying defendant's request to have her children brought before the jury. We acknowledge that defendant is entitled to present evidence in mitigation that is relevant to her character and reliable. See *People v. Edwards*, 144 Ill. 2d 108, 174-75 (1991). Here, however, the physical display of defendant's children to the jury was not relevant to defendant's character. We agree with the State that the jury could not have assessed defen-

dant's character as a mother simply by looking at the children. As such, displaying defendant's children before the jury was not relevant mitigating evidence. Accordingly, we conclude that the trial court properly denied defendant's request.

## F. Post-Sentencing Hearing

Defendant asserts that the trial court erred in ruling that the testimony of the defense's clinical psychologist at the post-sentencing hearing was not credible where that ruling was based solely on the fact that the clinical psychologist was not a medical doctor.

The record shows that defendant filed a motion to withdraw her guilty plea after she had been sentenced to death. The trial court conducted a hearing to determine whether defendant's guilty plea was intelligent, knowing, and voluntary. At the hearing, defendant's trial counsel testified that he talked to defendant three or four times about the plea and explained the advantages and disadvantages of pleading guilty. Trial counsel stated that he did not coerce defendant into pleading guilty. Rather, it was defendant's decision to plead guilty. In fact, according to trial counsel, defendant directed him to enter her plea of guilty. Defendant also testified at the post-sentencing hearing and contradicted trial counsel's testimony. Defendant insisted that it was trial counsel's idea for her to plead guilty. According to defendant, she pled guilty because trial counsel did not give her "much of a choice."

In addition to defendant, the defense called Dr. Michael Kovar, a clinical psychologist, to testify at the post-sentencing hearing. Dr. Kovar testified that he conducted several psychological tests on defendant. In his opinion, these tests showed that defendant was highly suggestible and easily misled. Dr. Kovar believed that defendant was confused about her guilty plea and did not know the basic facts. Dr. Kovar opined that defendant was not competent

to understand the language used by the judge regarding the relinquishment of her rights. For example, Dr. Kovar stated that defendant did not "have a clue" what reasonable doubt meant, did not understand the burden of proof, and was unsure exactly what the jury would be selected to hear. Dr. Kovar attributed defendant's lack of understanding to defendant's deficiencies in the "fund" of information, vocabulary, and commonsense reasoning. Based on his test findings, her mental status, her history and her overall presentation, Dr. Kovar concluded that defendant's plea of guilty was not knowingly and intelligently made, given defendant's lack of competence at the time she pled guilty. Dr. Kovar diagnosed defendant as having a depressive disorder, a general anxiety disorder, and presently manifesting borderline intellectual functioning.

After considering all of the evidence, the trial judge found Dr. Kovar's testimony to be incredible. The trial judge commented, "He's not a psychiatrist. He's not a medical doctor." The trial judge then proceeded to explain that Dr. Kovar's testimony was not credible based on the fact that he witnessed defendant when she pled guilty, and he believed trial counsel's testimony that it was defendant's idea to plead guilty. More specifically, the trial judge made the following findings:

"That [the plea] was her choice. She entered that plea in front of me. She was admonished as to what the penalties were, what her rights were. She indicated to me that she understood and I believed her, and I've been talking to defendants for a long time, that she did it knowingly, voluntarily and intelligently."

The trial judge ultimately denied the motion to withdraw the guilty plea.

Defendant contends that the trial court was improper in its ruling regarding Dr. Kovar's credibility as an expert witness. It is defendant's position that the trial court rejected Dr. Kovar's testimony for the sole reason that Dr.

Kovar was only a clinical psychologist as opposed to being a psychiatrist and a medical doctor. Defendant argues that it was irrelevant that Dr. Kovar was neither a psychiatrist nor a medical doctor. Because Dr. Kovar was a registered clinical psychologist, defendant insists that he was qualified by law to testify as to defendant's state of mind and mental impairments at the time of her guilty plea. In view of the trial court's improper basis for finding Dr. Kovar to be incredible, defendant contends that she is entitled to a new hearing on her motion to withdraw her guilty plea.

Initially, we note that a clinical psychologist is qualified to render an expert opinion as to a defendant's fitness to plead guilty, stand trial, be sentenced or be executed. 730 ILCS 5/5—2—5 (West 1992). In fact, the testimony of a clinical psychologist should not be disregarded merely because that witness is not a psychiatrist or a medical doctor. See *People v. Noble*, 42 Ill. 2d 425 (1969). Although a clinical psychologist's testimony should not be disregarded on this basis, the trial court is not required to accept the psychologist's opinion that the defendant was not competent. See *People v. Coleman*, 168 Ill. 2d 509, 525 (1995); *People v. Pugh*, 157 Ill. 2d 1, 24 (1993). It is the trial court's function to assess the credibility and weight to be given to psychiatric expert testimony. See *Coleman*, 168 Ill. 2d at 525.

After considering the trial judge's ruling, we find that the trial judge's determination that Dr. Kovar's testimony was incredible was not improper. We acknowledge that the trial judge improperly commented about the witness not being a medical doctor or a psychiatrist. The record, however, demonstrates that the trial judge did not reject Dr. Kovar's credibility because he was not a medical doctor or a psychiatrist. Rather, the trial judge did not agree with Dr. Kovar's conclusions because of his own observations of defendant while presiding over the proceed-

ings in this case, and because he found trial counsel to be credible. As stated, the trial court is not required to accept the expert's finding. Instead, it is the function of the trial court to assess the credibility of the expert's testimony. See *Coleman*, 168 Ill. 2d at 525. Consequently, the trial judge properly rejected Dr. Kovar's credibility in light of other evidence. We therefore conclude that the trial judge's comment regarding Dr. Kovar does not warrant the granting of a new hearing on the motion to withdraw defendant's guilty plea.

### G. Sufficiency of the Evidence

In view of our decision to remand this cause for a new sentencing hearing, double jeopardy requires that we determine whether the evidence was sufficient to support defendant's eligibility for the death penalty. See *People v. Brown*, 169 Ill. 2d 132, 164 (1996). After considering the evidence in the record, we find that it supports defendant's eligibility for death based on the statutory aggravating factors of murder of two or more individuals (720 ILCS 5/9—1(b)(3) (West 1992)) and murder committed in a cold, calculated and premeditated manner pursuant to a preconceived plan (720 ILCS 5/9—1(b)(11) (West 1992)). Consequently, there is no double jeopardy impediment to defendant's receiving a new capital sentencing hearing. See *Brown*, 169 Ill. 2d at 169. Nevertheless, we do not in any way imply that we have made a finding as to defendant's eligibility that would be binding on remand. See *Brown*, 169 Ill. 2d at 169.

## II. CONSTITUTIONALITY OF DEATH PENALTY STATUTE

As a final matter, defendant challenges the constitutionality of the Illinois death penalty statute. 720 ILCS 5/9—1 (West 1992). First, defendant claims that the statute is unconstitutional because it places a burden of proof on the defendant which precludes meaningful consider-

ation of mitigation evidence. Defendant also claims that the statute is unconstitutional because it allows the sentencer to weigh a vague aggravating factor, namely, "any other reason" a defendant should be sentenced to death. This court has already considered and rejected both arguments. See *Munson*, 171 Ill. 2d at 203-05; *People v. Simpson*, 172 Ill. 2d 117, 152 (1996); see also *Williams*, 173 Ill. 2d at 93-94; *People v. Gilliam*, 172 Ill. 2d 484, 522 (1996); *People v. Oaks*, 169 Ill. 2d 409, 470 (1996); *People v. Mitchell*, 152 Ill. 2d 274, 345-46 (1992). We decline to reconsider these issues given that defendant offers no persuasive reasons to depart from our prior decisions. In a separate argument, defendant contends that the death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. This argument has also been rejected by this court (see *Munson*, 171 Ill. 2d at 205-06; *Williams*, 173 Ill. 2d at 94; see also *People v. Tenner*, 157 Ill. 2d 341, 390 (1993); *People v. Edgeston*, 157 Ill. 2d 201, 247 (1993); *People v. Page*, 155 Ill. 2d 232, 283-85 (1993); *Mitchell*, 152 Ill. 2d at 346-47), and we likewise decline to reconsider our prior decisions because defendant presents no reasons that warrant a different result in this case. We therefore adhere to our prior decisions upholding the constitutionality of the Illinois death penalty statute.

## CONCLUSION

For the reasons set forth above, defendant's convictions are affirmed. Defendant's death sentence is vacated and this cause is remanded to the circuit court of Cook County for a new sentencing hearing consistent with the views expressed in this opinion.

*Convictions affirmed;*
*death sentence vacated;*
*cause remanded.*