# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: SEPTEMBER 26, 2019
NOT TO BE PUBLISHED

𝕾upreme 𝕮ourt of 𝕶entucky

2018-SC-000206-MR

DATE 3/26/20

ERIC LEE ANTHONY                                                   APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                         HON. AUDRA ECKERLE, JUDGE
NO. 16-CR-001742

COMMONWEALTH OF KENTUCKY                                   APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

Eric Lee Anthony appeals from a judgment of the Jefferson Circuit Court convicting him of two counts of wanton murder, two counts of second-degree assault, three counts of first-degree wanton endangerment, and one count of possession of a handgun by a convicted felon and sentencing him to imprisonment for life. We affirm.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

In 2010 Anthony shot Dontae Thompson. He was convicted of the shooting, was sentenced to prison, and had been released shortly before the June 21, 2016, shootings at issue in this case. There were hard feelings between Anthony and Thompson's extended family because of the 2010 shooting that resulted in suspicions on both sides.

Murder victims Donte Jefferson and Montae Compton were Thompson's cousins. Dequandre Brown was a friend of Jefferson and Compton's and was

also, unconnectedly, a friend of Anthony's. Brown, who was present at the shootings, testified that he, Jefferson, and Compton had followed Anthony in Jefferson's gray Chevrolet Impala earlier in the day to "see who he was with . . . see if he was on anything" because they were "hearing he's out to . . . kill us and things like that" and so they were "keeping tabs" on him. Anthony was familiar with Jefferson's Impala and was aware he was being followed.

The shootings occurred at an apartment located at 2802 Rodman Street in Louisville. Brown was a drug dealer and was frequently at that location dealing drugs.

Anthony was also a drug dealer. He testified that on the day of the shootings, he received a text from a customer wanting to buy marijuana. Anthony didn't have any marijuana, and he testified he decided to find his friend Brown and trade Brown some meth for some marijuana, something he had done in the past. Anthony knew that Brown regularly stayed at the Rodman Street apartment, and according to Anthony, he went to the apartment to complete the trade.

Anthony testified that while he expected Brown to be at the location, he did not expect Jefferson and Compton to be there. He further stated he would have avoided being in the same room with Jefferson because if that occurred, he believed Brown and Compton would be there as well and he would be outnumbered.

On the evening of June 21, 2016, Jefferson, Compton, and Brown, among others, were at the Rodman Street apartment. Jefferson and Compton

were armed with pistols. Brown testified that about an hour before the shootings, Anthony's girlfriend, Cicely Morris, drove slowly past the apartment twice, then parked in front of it. Morris lived about three blocks from the apartment, and Anthony was at Morris's apartment just before he left for the Rodman Street apartment around 10:00 p.m. Anthony testified he parked his car some distance away from the apartment and walked the rest of the way.

Jefferson had driven his Impala to the apartment that day, but he had parked it in back so that it could not be seen from Rodman Street. Anthony testified he did not see the Impala when he arrived at the apartment, and he would not have gone to the apartment if he had seen the car or otherwise known Jefferson was there. Nevertheless, although Anthony entered the apartment from the back, he testified he did not see the Impala as he entered.

Anthony testified he carried a gun most of the time and had one with him that evening. When Anthony arrived at the apartment, the rear door was open. Brown and Jefferson were in the kitchen seated at the kitchen table, with Jefferson nearest the door. Compton was in the front area of the apartment. Tiffany Funk and Craig Ziegler were in the kitchen standing by a cabinet, Jenna King was in a bedroom, and Ashley Hodges had just started to enter the bathroom. King and Hodges lived in the apartment.

Anthony entered the apartment and asked where Brown was. According to Brown, someone "yell[ed] my name . . . me and Donte looked at each other like who was that . . . [Jefferson] reached for his gun" but "it fell out of his lap . . . he was reaching for his gun, picking his gun up, so . . . I knew he was ready

3

to pick his gun up, he was ready to start shooting." Brown stated he then ducked into a closet.

Elsewhere in his testimony, Brown stated Anthony did not have his gun drawn when he first walked in, but Jefferson first introduced a gun into the situation by "go[ing] for his gun," dropping it, and then starting to pick it up. Brown testified Anthony "was pulling [his gun] out at the same time that [Jefferson] was picking his gun up," but Jefferson had started to pick up his gun first before Anthony began shooting. It is worth noting, however, that Jefferson's picking up his gun does not necessarily equate to an intent to fire at Anthony after retrieving it.

In contrast, Anthony testified that when he arrived at the back door, Montea Compton drew his gun and he responded by raising his hands and saying he was just there looking for Brown. According to Anthony, Compton responded by placing the gun back on his lap. Anthony stated he started walking toward Brown and then heard a thump and looked and saw Jefferson trying to pick up his gun from the floor. Anthony then testified, "he's got his hand on his gun, he's trying to pick it up, but looking at me."

Anthony testified that upon seeing Jefferson pick up his gun and look at him, he felt "panic," drew his gun, and, while trying to back out of the apartment, fired a shot toward Jefferson. Anthony stated he then observed Compton "going for his gun again," and so he shot toward Compton as well. Anthony testified that while he was trying to exit the apartment, he saw other people coming out of a bedroom and so he "just fired[d] two more random

4

shots" and ran from the apartment. He further stated that while fleeing, he saw that the front door was opening, and so he fired a couple of more shots because he believed he was being chased.

As a result of the shootings, Jefferson and Compton were killed, and Ashley Hodges and Craig Ziegler were wounded.

Sergeant Jason Vance was the lead detective on the case. Shortly after the shootings, he interviewed Tiffany Funk and Ashley Hodges. Both identified Anthony as the shooter. Anthony was arrested shortly after the shootings and denied any involvement in the occurrence, including even being at the apartment. Anthony filed a pretrial motion seeking to exclude Funk and Hodges' out-of-court identification of him.

Anthony's defense at trial, contrary to his statement to the police the night of the shooting when he claimed he was not at all involved, was self-defense. At the end of the trial, the jury convicted Anthony of two counts of wanton murder, two counts of second-degree assault, three counts of first-degree wanton endangerment, and one count of possession of a handgun by a convicted felon. He was sentenced to imprisonment for life.

## II. CROSS-EXAMINATION OF ANTHONY ON HIS PRETRIAL MOTION TO SUPPRESS

Anthony contends the trial court erred by permitting the Commonwealth to cross-examine him concerning his filing an unsuccessful pretrial motion to suppress Tiffany Funk and Ashley Hodges' identification of him. He argues that the subject matter of the cross-examination was not relevant at trial and served only to penalize him for asserting a constitutional right. He also

5

contends that permitting cross-examination on the suppression motion had the additional effects of impeding his right to advice of counsel, his right to testify on his own behalf, and his right to present a defense.

Tiffany Funk and Ashley Hodges were both present at the Rodman Street apartment when the shootings occurred, and both already knew Anthony. Hodges testified she saw Anthony at the apartment but did not see the actual shootings, while Funk testified she saw Anthony firing the gun. Funk and Hodges were interviewed by the police following the shootings, and both witnesses identified Anthony as the shooter.

Anthony filed a motion to suppress both the pretrial identification of him as unduly suggestive and any in-court identification of him as being the product of an unduly suggestive identification process. *See Neil v. Biggers*, 409 U.S. 188 (1972); *Perry v. New Hampshire*, 565 U.S. 228 (2012). The trial court denied the suppression motion, and Anthony does not challenge that ruling; rather, he challenges the trial court's ruling permitting the Commonwealth to cross-examine him on his having filed the motion.

The Commonwealth contends this cross-examination was proper because its purpose was to reveal Anthony's shifting stories and changing defenses and to impeach him on these differing versions. Further, the Commonwealth asserts its cross-examination demonstrated that when Anthony could not keep these witnesses from testifying, he abandoned his original claim that he was not present at the Rodman Street apartment that night and instead switched to a self-protection defense.

6

Our holding addressing an analogous situation in *Coulthard v. Commonwealth*, 230 S.W.3d 572 (Ky. 2007), is dispositive of this issue. In *Coulthard* the defendant was convicted of first-degree manslaughter and tampering with physical evidence. On appeal Coulthard argued his constitutional right to be free of warrantless searches was violated when the Commonwealth introduced evidence that he had refused to consent to a fingerprint sampling during the investigation. In support of his argument, Coulthard relied on *Deno v. Commonwealth*, 177 S.W.3d 753 (Ky. 2005), a case in which we held it is unconstitutional to penalize a defendant for exercising his constitutional right to be free of warrantless searches. In *Deno* the defendant refused to voluntarily consent to the taking of a biological specimen, which refusal was then used against him at trial to show he acted inconsistently with how an innocent person would act. *Id.* at 762 ("Nevertheless, the fact of Appellant's initial refusal was presented as evidence of his guilt and argued as such by the Commonwealth. We believe this to be a violation of Appellant's rights under the Fourth Amendment and Section 10 of the Constitution of Kentucky[ ]").

Anthony raises a similar argument here. He argues his pretrial motion was predicated upon his constitutional right not to be subjected to an improperly obtained suggestive identification under *Neil v. Biggers*, and the filing of that motion to vindicate this right was improperly allowed to be used thereafter by the Commonwealth at trial as evidence of guilt. Just as was *Coulthard*, however, this case is distinguishable from *Deno*. Unlike in *Deno*

7

where the Commonwealth used the defendant's refusal to give a biological specimen purely to show that is not how an innocent person would act, here there was a legitimate and proper use of the pretrial motion to, at minimum, demonstrate (1) Anthony's shifting and contradictory defenses, and (2) a pattern in attempting to silence witnesses.

"In determining whether a constitutional right has been burdened impermissibly, it also is appropriate to consider the legitimacy of the challenged governmental practice." *Coulthard*, 230 S.W. 3d at 583 (citing *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980)). In *Coulthard* we distinguished the use of the fingerprint evidence impeachment from the facts in *Deno* in that Coulthard's refusal to consent to fingerprint sampling was relevant for purposes other than to simply penalize him for the exercise of a legal privilege, whereas there was no such legitimate other purpose in *Deno*. *Coulthard*, 230 S.W.3d at 582.

More specifically, in *Coulthard* we acknowledged the Commonwealth utilized his refusal to consent to a fingerprint sample for the legitimate purposes of rebuttal and impeachment of a self-defense claim advanced by Coulthard at trial. That is similar to what occurred here. In this case the Commonwealth did not seek to introduce the identification suppression motion evidence to penalize Anthony by arguing an innocent person would not do that. Rather, the Commonwealth sought to impeach Anthony's self-defense claim by showing he originally denied being at the Rodman Street apartment, but later

changed his trial strategy when he was unable to suppress the eyewitness testimony placing him at the apartment.

This case is on point with *Coulthard*. There, the Commonwealth argued Coulthard's claim of self-defense was not credible considering the circumstances that transpired following the shooting, including evidence which tended to show Coulthard initially did everything in his power to deny involvement, including destroying evidence, and only when those attempts failed did Coulthard change his story and claim self-defense. *Id.* at 582-83. That is substantially what occurred here.

In finding that the refusal to submit to fingerprint sampling in *Courthard* was properly used against the defendant at trial, we stated as follows:

> Once Appellant submitted himself to cross-examination after claiming self defense at trial, it was not only appropriate but necessary for the Commonwealth to impeach Appellant's credibility and rebut his allegations. **As the traditional truth-testing devices of the adversarial process, impeachment and rebuttal are vital to ensuring a just and fair trial. Thus, preserving each party's right to utilize such devices at trial should weigh heavily when considering counterbalancing claims of "constitutional privilege."** *See Jenkins*, 447 U.S. at 238, 100 S.Ct. 2124 ("Once a defendant decides to testify, '[t]he interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.'") (quoting *Brown v. United States*, 356 U.S. 148, 156, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958)).

*Coulthard*, 230 S.W.3d at 584 (emphasis in original). *See also Jenkins*, 447 U.S. at 238 (The use of the defendant's pre-arrest silence against him at trial was not unconstitutional since "impeachment follows the defendant's own

decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial[ ]").

Coulthard also relied upon another case similar to this one, United States v. Robinson, 485 U.S. 25 (1988). Coulthard, 230 S.W.3d at 583. In Robinson the defendant's attorney argued several times during closing argument that the government never allowed the defendant (who did not testify) to explain his side of the story. 485 U.S. at 26. In response, the prosecutor commented during his closing argument that the defendant "could have taken the stand and explained it to you." Id. The defendant's convictions were subsequently reversed on grounds that the prosecutor's comment regarding the defendant's failure to take the stand in his own defense violated the defendant's privilege against self-incrimination. Id. at 29.

Upon review, the U.S. Supreme Court in Robinson found no violation of any constitutional rights since the prosecutor's "reference to the defendant's opportunity to testify [was] a fair response to a claim made by defendant or his counsel." Id. at 32. In so holding, the Court quoted Justice Stevens for the following principle: "the protective shield of the Fifth Amendment should [not] be converted into a sword that cuts back on the area of legitimate comment by the prosecutor on the weaknesses in the defense case." Id. (quoting United States v. Hasting, 461 U.S. 499, 515 (1983) (Stevens, J., concurring) (citation omitted)). See Coulthard, 230 S.W.3d at 583.

We also stated in Coulthard that "[a]lthough Jenkins and Robinson involved the privilege against self-incrimination and whether arguments

regarding its use violated either the Fifth or Fourteenth Amendments, the principles set forth therein aptly apply to this case and the determination as to whether these facts violated [*Neil v. Biggers*] and Section 10 of the Kentucky Constitution." *Id.* at 584.

*Coulthard* concluded with the following summary of the rule we apply here:

> Generally, such as in *Deno*, exercising one's privilege to be free of warrantless searches is simply not probative (or has low probative value) to a determination of guilt, and thus, the defendant's right to not be penalized for exercising such a privilege is paramount. *See*, e.g., *United States v. Thame*, 846 F.2d 200, 207 (3rd Cir. 1988), *United States v. Prescott*, 581 F.2d 1343, 1350–51 (9th Cir. 1978).
>
> However, in circumstances when such evidence is probative for some purpose other than to simply penalize the defendant for exercising a constitutional right, then notions of fair play and the need to preserve the truth-testing functions of the adversarial process may outweigh the defendant's interest in suppressing the evidence.

*Id.* at 584.

The facts in this case do not demonstrate a violation of Anthony's constitutional rights under *Neil v. Biggers*, any other federal constitutional section, or Section 10 of Kentucky's Constitution. The circumstances surrounding Anthony's efforts to suppress the identifications by Hodges and Funk were fairly admitted for the proper purposes of rebutting and impeaching Anthony's claim of self-defense. Since we find that Anthony was not unfairly penalized for exercising a constitutional right in this case, he is not entitled to relief on this issue. *See Coulthard*, 230 S.W.3d at 584.

11

Anthony makes essentially the same argument that the cross-examination on the suppression issue was improper because it impeded his right to advice of counsel, his right to testify on his own behalf, and his right to present a defense. For the same reasons as explained above, we conclude that the suppression motion evidence was properly presented to counter and impeach Anthony's self-protection defense. *See Coulthard, supra.*

The concurring opinion disagrees with the above analysis determining that the trial court properly allowed the prosecutor to cross-examine Anthony on his motion to suppress eyewitness identification so as to demonstrate to the jury Anthony's shifting defense from "I wasn't there" to self-defense and thus to refute his self-protection defense and, ancillary to that, to impeach his credibility.

Under the facts of this case, pursuant to our holding in *Coulthard*, it was permissible for the Commonwealth to call into question Anthony's self-protection defense by noting he had acted inconsistently with that defense by initially falsely claiming he was not at the residence that night, then seeking to suppress witness testimony showing he was present at the time of the shootings, and failing that, fabricating an entirely new defense of self-protection.

Once Anthony raised self-protection as his defense, the burden was then placed upon the Commonwealth to show that he did not act in self-defense. *Estep v. Commonwealth*, 64 S.W.3d 805, 811 (Ky. 2002). Anthony admitted at trial that he had fired the shots, and the central issue in the case at that point

was whether those shots were fired in self-defense. Any evidence relating to that issue had probative value and was properly subject to consideration by the jury in making its decision concerning whether Anthony had fired in self-defense.

KRE 611(b) provides as follows: "Scope of cross-examination. A witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401; *Moorman v. Commonwealth*, 325 S.W.3d 325, 332 (Ky. 2010). Evidence that Anthony at the outset of the criminal proceedings falsely claimed he was not present at the residence and sought to suppress the testimony of witnesses who would place him there makes it less probable that he committed the shootings in self-protection; rather, it casts doubt on the defense as a *post hoc* rationalization for the shootings. Nor is the probative value of the evidence substantially outweighed by the danger of undue prejudice, confusion of the issues, misleading to the jury, or needlessly cumulative. KRE 403. Thus, under a KRE 401-403 relevance analysis, we believe the evidence is admissible.

The concurring opinion recognizes that evidentiary rules allow an attack on a witness's credibility, but it also asserts that Anthony did not testify at the suppression hearing, that the mere filing of the motion was a decision of his defense counsel, and that such decision and the filing of the motion cannot be

13

attributed to Anthony for purposes of impeachment. In other words, the concurring opinion holds that cross-examining Anthony was not an acceptable manner of impeaching him because his defense counsel's tactical decision in seeking to suppress the eyewitnesses' identification had no bearing on his credibility as a witness.

In support of its position, the concurring opinion cites *Neal v. Commonwealth*, 95 S.W.3d 848 (Ky. 2003), and *People v. Mulero*, 176 Ill.2d 444, 680 N.E.2d 1329 (1997). In *Neal* the defendant attempted to impeach the trial testimony of a co-defendant in another matter in order to demonstrate that the co-defendant had a pattern of blaming the defendant for other shootings. *Id.* at 849. This Court held that such was improper as collateral impeachment evidence. *Id.* Impeachment on collateral facts has consistently been prohibited under our law. *Matheny v. Commonwealth*, 191 S.W.3d 599, 607 (Ky. 2006). Here, however, the introduction of the suppression motion to refute Anthony's self-protection defense is not impeachment on a collateral matter; rather, it is crucial evidence whereunder the Commonwealth seeks to meet its burden of showing that Anthony did not act in self-defense.

The concurring opinion also relies in part on the *Mulero* case from Illinois. *See Mulero*, 680 N.E.2d 1329. For the reasons stated above, we believe our opinion in *Coulthard, supra*, is dispositive and does not require us to seek guidance from the courts in Illinois. Further, we believe the facts in *Mulero* are sufficiently distinguishable from the facts in *Coulthard* and the facts herein to warrant a different result.

14

The concurring opinion emphasizes the fact that the suppression motion was a trial tactic or strategy and that such tactical decisions have no bearing on a defendant's credibility. Again, however, the purpose of the evidence was to rebut his self-protection defense and demonstrate its recent fabrication. And, presumably, the tactics and strategy of the attorney were consistent with Anthony's defense as developed in concert with his attorney

The concurring opinion would disallow the cross-examination of Anthony concerning the suppression motion because Anthony did not testify at the hearing of the motion. The concurring opinion asserts that the suppression motion itself has no bearing on Anthony's credibility as a witness. In the majority's view, however, the suppression motion itself undermines the credibility of Anthony's trial testimony wherein he raised the defense of self-protection.

## III. INITIAL AGGRESSOR QUALIFICATION INSTRUCTION

Anthony contends the trial court erred by giving an initial aggressor instruction in connection with his self-protection defense.

KRS 503.050 provides, in relevant part, as follows:

(1) The use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is necessary to protect himself against the use or imminent use of unlawful physical force by the other person.

(2) The use of deadly physical force by a defendant upon another person is justifiable under subsection (1) only when the defendant believes that such force is necessary to protect himself against death, serious physical injury, kidnapping, sexual intercourse

15

compelled by force or threat, felony involving the use of force, or under those circumstances permitted pursuant to KRS 503.055.[1]

The initial aggressor statute, KRS 503.060 provides, in part, as follows:

Notwithstanding the provisions of KRS 503.050, the use of physical force by a defendant upon another person is not justifiable when:

(2) The defendant, with the intention of causing death or serious physical injury to the other person, provokes the use of physical force by such other person; or

(3) The defendant was the initial aggressor, except that his use of physical force upon the other person under this circumstance is justifiable when:

(a) His initial physical force was nondeadly and the force returned by the other is such that he believes himself to be in imminent danger of death or serious physical injury; or

(b) He withdraws from the encounter and effectively communicates to the other person his intent to do so and the latter nevertheless continues or threatens the use of unlawful physical force.

Here, the trial court instructed the jury consistently with KRS 503.050 and KRS 503.060 in each of the instructions relating to the shootings of Jefferson, Compton, Hodges, and Zeigler.

In *Randolph v. Commonwealth* the Court of Appeals stated as follows:

As the Kentucky Supreme Court explained, albeit in an unpublished decision, "[t]he purpose of the initial aggressor doctrine, like the 'provocation doctrine', is to prevent a defendant from instigating a course of conduct then claiming he was acting in self-defense when that conduct unfolds." *Hayes v. Commonwealth*, 2015-SC-000501-MR, 2017 WL 639387, at *4 (Ky. Feb. 16, 2017).

566 S.W.3d 576, 578 (Ky. App. 2018).

---

[1] KRS 503.055 addresses the no duty to retreat/castle doctrines.

16

Similarly, as stated in *Stepp v. Commonwealth*, in determining whether a limitation to a self-defense instruction is proper, the trial court must consider the circumstances surrounding the incident as a whole:

> It is not every assertion of such belief that is adequate to support a plea of self-defense. It is the whole circumstances which surround the incident that must be considered by the trial judge in deciding whether an instruction on self-defense is proper or whether an instruction on self-defense with limitations is proper. We have held that before such qualifying instructions are proper there must of course be evidence to justify it. In other words, the trial judge must find as a matter of law that there is sufficient evidence to justify such limitations before instructing the jury. *Mayfield v. Commonwealth*, Ky., 479 S.W.2d 578 (1972); *Crigger v. Commonwealth*, Ky., 225 S.W.2d 113 (1949).

608 S.W.2d 371, 374 (Ky. 1980); *see also Welch v. Commonwealth*, 235 S.W.3d 555, 561 (Ky. 2007).

In summary, for a defendant to be the initial aggressor, the defendant must use physical force prior to any act of purported self-protection. KRS 503.060(3)(a).

It is the trial court's obligation to "instruct the jury upon every theory reasonably supported by the evidence." *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015). Review of a trial judge's decision whether to give an instruction is under an abuse of discretion standard. *Id.* "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)).

17

Anthony argues that an initial aggressor instruction was not warranted in this case for two reasons. His first argument is somewhat unclear, but it centers upon the following sentence to the commentary to KRS 503.050: "This limitation applies to the situation where a defendant, **not having an intent to cause death or serious physical injury**, starts an encounter with another and subsequently finds himself believing in a need to use physical force, perhaps deadly, to protect himself from the other's attack." (emphasis by Anthony). From this section of the commentary, Anthony argues:

> The Commonwealth's theory – that Eric Anthony went to the apartment "to ambush" and "that if you're out hunting somebody, and then when you get there, they have a weapon to hunt you back, you're still not allowed to argue self-protection – is an argument that Eric Anthony had the "intent to cause death or serious physical injury" all along. At its core, this is an argument that Eric Anthony had committed intentional murder and not that he acted in self-defense, but was not legally entitled to do so because he was the initial aggressor. Therefore, this is not, as explained in the statutory commentary, the contemplated scenario that justifies qualifying a self-protection defense with the initial aggressor instruction. *See* KRS 503.050, Commentary. In sum, even accepting arguendo the theory proposed by the Commonwealth, the trial court providing an initial aggressor jury instruction was error in this case.

There were conflicting theories concerning Anthony's purpose for going to the apartment on the evening of the shootings and how the events transpired. Likewise, there were conflicting theories concerning who intended what once he got there and the shooting started.

We conclude the initial aggressor instruction was proper under the circumstances of this case. First, if, as the Commonwealth suggests, Anthony went there armed with a pistol looking for Jefferson to confront him over the

18

ongoing hostilities between Anthony and the Jefferson family and then entered the apartment armed and without announcing himself, the jury could have believed Anthony was the initial aggressor and not entitled to an absolute self-protection defense even if Jefferson was trying to pick up his gun to shoot at Anthony.

Also, even if the jury believed Anthony had gone to the apartment merely to do a drug trade with Brown, the jury could still have believed Anthony was the initial aggressor because it also could have believed all Jefferson was doing when Anthony shot him was picking up his gun after it had accidently fallen to the floor. In that case as well, the jury could have believed Anthony was the initial aggressor because Jefferson had taken no action other than picking up his pistol without any intent to harm Anthony after he had retrieved it.

Anthony's second point is also somewhat unclear. He argues that an initial aggressor instruction was not proper in this case because:

> But to the extent that this evidence proved that Eric Anthony was looking for Donte Jefferson and had reason to believe that Mr. Jefferson would be at the apartment, this evidence suggests that Mr. Anthony intended to kill Mr. Jefferson before he went to the apartment that night, not that he intended to confront Mr. Jefferson, who in turn responded, which then caused Mr. Anthony to have to use deadly physical force in self-defense. Therefore, this evidence did not establish that Eric Anthony had acted as an initial aggressor on that night. *See* KRS 503.050, Commentary.

Under this argument Anthony appears to distinguish between whether when going to the apartment to shoot Jefferson he was intending to summarily shoot Jefferson or to first confront him to create some sort of standoff with him before shooting him. By going to the apartment with the specific intent to use

19

deadly force against Jefferson in the first instance, a juror could conclude that Anthony was the initial aggressor, and any doubt raised to the contrary because of the dropped gun and other alternative interpretations of the evidence, including Anthony's failure to create a standoff, authorized the initial aggressor instruction.

In short, there was sufficient evidence for the jury to conclude that Anthony came in the back door, surprised the occupants, and shot four of them in a matter of a few seconds and before they had a chance to defend themselves or otherwise evade him. Based on that evidence, he would have been the initial aggressor. We conclude the trial court did not abuse its discretion by giving an initial aggressor instruction as to all four shootings.

## IV. EVIDENCE OF PRIOR SHOOTING

Anthony contends the trial court erred by permitting the Commonwealth to introduce evidence that in 2010 he had shot Dontae Thompson, who was the cousin of both murder victims, Jefferson and Compton.

Anthony shot Thompson in 2010, admitted and pled guilty to the assault, was sentenced to prison, and had been released not long before the June 21 shootings. Anthony filed a pretrial motion to exclude the 2010 shooting pursuant to KRE 404(b). The trial court denied the motion. When the Commonwealth raised the issue at trial, Anthony again objected, and the trial court again overruled the objection.

KRE 404(b) provides, in relevant part, as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove
> the character of a person in order to show action in conformity
> therewith. It may, however, be admissible:
>
> (1) If offered for some other purpose, such as proof of motive,
> opportunity, intent, preparation, plan, knowledge, identity, or
> absence of mistake or accident;....

Generally, evidence of crimes other than that charged is not admissible. KRE 404(b); Lawson, *Kentucky Evidence Law Handbook*, 5th Ed., § 2.30[1][a] (2013). However, evidence of other crimes or wrongful acts may be introduced as an exception to the rule if relevant to prove motive, opportunity, intent, plan, knowledge, identity, or absence of mistake or accident. KRE 404(b)(1). To be admissible under any of these exceptions, the acts must be relevant for some purpose other than to prove criminal predisposition, and they must be sufficiently probative to warrant introduction. Further, the probative value of the evidence must outweigh the potential for undue prejudice to the accused. *Clark v. Commonwealth*, 833 S.W.2d 793, 795 (Ky. 1991); *Chumbler v. Commonwealth*, 905 S.W.2d 488, 494 (Ky. 1995).

As this Court has previously stressed, KRE 404(b) is "exclusionary in nature," and as such, "any exceptions to the general rule that evidence of prior bad acts is inadmissible should be closely watched and strictly enforced because of [its] dangerous quality and prejudicial consequences." *O'Bryan v. Commonwealth*, 634 S.W.2d 153, 156 (Ky.1982). To determine the admissibility of prior bad act evidence, we have adopted the three-prong test as described in *Bell v. Commonwealth*, 875 S.W.2d 882, 889–91 (Ky.1994), which evaluates the proposed evidence in terms of: (1) relevance, (2) probativeness,

21

and (3) its prejudicial effect. We review the trial court's application of KRE 404(b) for an abuse of discretion. *Anderson v. Commonwealth,* 231 S.W.3d 117, 119 (Ky. 2007); *Driver v. Commonwealth,* 361 S.W.3d 877, 883 (Ky. 2012). "The test for abuse of discretion is whether the trial [court's] decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

There was an abundance of evidence that the 2010 shooting resulted in hostility and anger between Anthony and Dontae Thompson's extended family, including Jefferson. Thus, evidence concerning the 2010 shooting was indispensable to explain the dynamics underpinning this shooting. The trial court did not abuse its discretion by permitting the Commonwealth to introduce evidence concerning the 2010 shooting.

## V. CONCLUSION

The judgment of the Jefferson Circuit Court is affirmed.

All sitting. Minton, C.J., Buckingham, Hughes, VanMeter, JJ., concur. Keller, J., concurs in result only by separate opinion, in which Lambert and Wright, JJ., join.

KELLER, J., CONCURRING IN RESULT ONLY: I concur with the majority's well-written opinion regarding the initial aggressor instruction and evidence of the prior shooting, but I strongly disagree with the majority's analysis as it relates to the cross-examination of Anthony on his motion to suppress. For the reasons set forth below, I believe the motion to suppress was

22

improper impeachment evidence and irrelevant, and it was therefore inadmissible.

## I. BACKGROUND

Shortly after the June 21, 2016 shooting, detectives interrogated Anthony. During that interrogation, Anthony repeatedly claimed that he was not involved in the murders. However, two witnesses to the shooting, Ashley Hodges and Tiffany Funk, identified Anthony and placed him at the scene. Anthony was ultimately charged with two counts of murder, among other charges. Prior to his trial, Anthony, through counsel, filed a motion to suppress the out-of-court identifications made by Hodges and Funk. More specifically, the motion stated that Anthony sought to exclude these identifications because these witnesses were not shown a photopak, and instead "each witness was suggestively shown only one photo—a photo of Mr. Anthony—to identify the shooter." The motion also explained that these witnesses had an opportunity to confer with other witnesses prior to being shown the photo. There is no reference in the motion to suppress or its supporting memorandum to Anthony's initial denial of involvement; it addresses only the allegedly unduly suggestive nature of the identification process. The motion was ultimately denied.

Later, at trial, Anthony presented a self-defense theory in which he admitted shooting the two victims, but only after one of the victims first attempted to draw his weapon on Anthony. Anthony testified to this version of events at trial. During his cross-examination, the Commonwealth questioned

23

Anthony on the filing of his motion to suppress. Anthony's counsel objected on the grounds that this line of questioning effectively punished Anthony for asserting a constitutional right, namely, the right to ensure that the evidence at trial meets constitutional standards. The objection was overruled.

The prosecution argues that it questioned Anthony about his pretrial motion to suppress to expose Anthony's change in defense theories and to thereby impeach his credibility and rebut his self-protection defense. The majority concludes that this was "a legitimate and proper use of the pretrial motion," as it was not presented as evidence of guilt, but rather to impeach Anthony and rebut his claims of self-defense. I disagree.

## II.    ANALYSIS

### A. Our rules of evidence do not allow the prosecution to attack the credibility of a defendant by referencing the filing of pretrial motions.

I turn first to the plain language of Kentucky Rule of Evidence ("KRE") 607, which states that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." Black's Law Dictionary defines impeachment evidence as "[e]vidence used to undermine a witness's credibility." *Impeachment Evidence*, Black's Law Dictionary (11th ed. 2019). Thus, impeachment focuses on the credibility of the *witness*. Accordingly, a party may question a witness on his or her bias, interest, or hostility, including the witness's relationships, personal and monetary interests in the outcome of

24

the case, and susceptibility to corrupting influences[2]; certain prior

convictions[3]; prior conduct[4]; and prior inconsistent statements.[5] The common

thread among these methods of impeachment is that each involves the actions

or statements (or, in some limited cases, silence[6]) of the *witness*. This follows

naturally from KRE 607's authorization to attack the *witness's* credibility.

In the present case, however, the prosecution questioned Anthony about

the mere *filing* of the motion to suppress, not his prior actions, statements, or

silence. Anthony did not testify at the suppression hearing and therefore did

not make any statements regarding the suppression motion or its filing. In fact,

the cross-examination on this issue revealed that the motion was a tactical

decision made by defense counsel. For example, when asked whether he was

aware "through [his] attorney" that there were "legal ways" to challenge the

potential in-court identification, he stated "I'm not no, the attorney, so I don't,

didn't know any specifics of how it could be challenged."[7] Video Record ("VR")

---

[2] *See* ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 4.10 (5th ed. 2013).

[3] *See* KRE 609; LAWSON, *supra*, at § 4.30.

[4] *See* KRE 608; LAWSON, *supra*, at § 4.25.

[5] *See* KRE 613 (providing prerequisites for introduction of prior statements); LAWSON, *supra*, at § 4.15.

[6] *See Cunningham v. Commonwealth*, 501 S.W.3d 414, 419 (Ky. 2016) ("When the evidentiary requirements of KRE 801A(b)(2) are satisfied, the party's silence, or 'adoptive admission,' may be used for both substantive and impeachment purposes.").

[7] Similarly, Anthony answered in the affirmative when the Commonwealth asked about his involvement in the discovery process: "You've looked at it all, and you've done that not by yourself but obviously you've had an attorney to help you because that's sort of the process, right?" VR 1/5/18, 5:49:10–5:49:18. And again during cross-examination, the prosecution asked whether Anthony "through [his] attorney, with [his] attorney," conducted an investigation into the facts of the case, to which Anthony replied, "I believe my attorney has." VR 1/5/18, 5:56:44–5:57:12. In

25

1/5/18, 5:52:18–5:52:35. Simply put, then, the prosecution attempted to impeach Anthony with the actions and trial strategy of his attorney. This is not an acceptable method of impeachment under our rules of evidence, as a defense counsel's tactical decisions have no bearing on the defendant's credibility. Therefore, its use as impeachment evidence was improper under our Rules of Evidence.

This Court hinted at a similar analysis in *Neal v. Commonwealth*, 95 S.W.3d 843 (Ky. 2003). In that case, Neal and his co-defendant, Strong, were charged with wanton murder and first-degree robbery for the fatal shooting of a minister. At trial, Neal sought to impeach the trial testimony of Strong by introducing a tape of Strong's suppression hearing testimony in another matter. Neal argued that this evidence would have demonstrated that Strong had blamed Neal for other shootings and therefore had a pattern of blaming him. The Court ultimately held that this was an improper attempt to introduce collateral impeachment evidence. In reaching that decision, the Court noted,

> It is clear that Neal was not seeking to impeach Strong with his prior testimony because Strong never directly blamed Neal. Instead, Neal was trying to impeach Strong *with the actions and trial strategy of his defense counsel at a suppression hearing* in another matter. There, defense counsel was only trying to shift the blame away from Strong.

---

response, the prosecution stated, "Right, I mean, you're not able to do it, [defense counsel's] doing it for you, that's her job." VR 1/5/18, 5:57:12–5:57:16. As this line of questioning demonstrates, certain legal decisions are typically made by the attorney, hopefully with consultation with his or her client as necessary.

26

*Id.* at 849 (emphasis added). In this brief snippet from *Neal,* the Court hinted that it was improper to impeach a defendant with "the actions and trial strategy of his defense counsel." *Id.*

On this issue, the present case is clearly distinguishable from *Coulthard v. Commonwealth,* 230 S.W.3d 572 (Ky. 2007), the case relied upon by the prosecution and the majority. In that case, it was proper to introduce evidence that the defendant refused to consent to fingerprinting for "purposes of rebuttal and impeachment of a self defense claim." *Id.* at 582. However, the evidence at issue in that case—the refusal to submit to fingerprinting—stemmed from the defendant's own conduct, i.e. *defendant's* refusal to submit to fingerprinting. Because the actions at issue in *Coulthard* were those of the defendant himself, that Court never needed to consider the pressing issue in this case, namely, whether a defendant can be impeached with the actions and tactical decisions of his attorney. I believe that this issue is crucial in the present case, and, for the reasons set forth in this opinion, it must be decided in the negative.

On this point, the case of *People v. Mulero,* 176 Ill.2d 444 (Ill. 1997), a case cited by Anthony, is instructive. Although the majority asserts that *Mulero* is distinguishable from the case at bar, the majority fails to note any distinction. To the contrary, respectfully I assert that *Mulero* is directly on point. In that case, the defendant pled guilty after failing to suppress her confession. At her sentencing hearing, the defendant stated that she felt remorse immediately after committing the crimes and pled guilty as a result. The prosecution then impeached the defendant with her testimony at her

27

suppression hearing, in which she argued that her *Miranda* rights had been violated and her confession coerced. The prosecution utilized this testimony to suggest that the defendant pled guilty only because she could not suppress her confession, not because she felt remorse. The court found this to be a proper form of impeachment. It explained that the prosecution "was permitted to challenge defendant's credibility regarding her motive for pleading guilty by commenting on defendant's apparent lack of remorse as evidenced by her *testimony* at the suppression hearing." *Id.* at 466–67.

However, during its cross-examination and in closing, the prosecutor in *Mulero* also brought up the *filing* of the motion to suppress to argue that the defendant lied when claiming remorse. The court found that this "went far beyond the permissible commentary to suggest that defendant's exercise of a constitutional right be used as aggravation evidence against her." *Id.* at 467. The court therefore held that the mere *filing* of the motion was irrelevant for substantive and impeachment purposes. *Id.* at 467. In reaching that conclusion, the court noted that "[s]uch comments have a chilling effect on a defendant's exercise of his or her constitutional right by making assertion of a particular right costly." *Id.* at 462–63.

Similarly, in the present case, the prosecution attacked Anthony's self-defense claims by introducing his prior inconsistent statements as well as evidence of the filing of a motion to suppress. First, the prosecution entered into evidence a video recording of Anthony's initial interview with police, in which he insists that he was not involved in the shooting. Such prior

inconsistent statements can be used to attack a witness's credibility, assuming a proper foundation is established under KRE 613. However, the prosecutor also attempted to use defense counsel's filing of a motion to suppress to impeach Anthony. I cannot reconcile this with our well-established precedent on proper impeachment evidence, or the holding in *Mulero*. The aforementioned do not permit the prosecution to attack the credibility of a defendant by introducing evidence of defense counsel's legal and tactical decisions; those decisions cannot be imputed to the defendant, are not pertinent to his credibility as a witness, and are not proper under KRE 607, 608 or 613. Accordingly, like the *Mulero* court, I hold that the motion to suppress in this case was improper impeachment evidence.

### B. The filing of the motion to suppress was irrelevant for purposes of rebutting Anthony's claims of self-defense because the motion focused only on Anthony's due process claims and did not address his defense theories.

In the present case, the Commonwealth argued that Anthony switched from his initial denial of involvement to self-defense only because he failed to suppress the out-of-court identifications. The majority further asserts that the filing of the motion to suppress contradicted Anthony's earlier claim that he was not present at the scene of the shooting. However, the motion to suppress is not inconsistent with either defense theory. The motion merely alleges that the procedures used by the police to obtain those identifications were unduly suggestive and therefore violated Anthony's constitutional rights. It does not deny that Anthony was present at the shooting, nor does it make any

29

allegations related to Anthony's self-defense claims. In fact, it makes no reference whatsoever to Anthony's involvement in the shootings, or lack thereof. Simply put, the motion to suppress does nothing more than allege that the out-of-court identifications were unconstitutionally obtained.

To be clear, I do not contest the appropriateness of questioning a defendant during cross-examination to challenge the defendant's claims of self-defense.[8] Nor do I contest the general statement made in *Coulthard* that "in circumstances where such evidence is probative for some purpose other than to simply penalize the defendant for exercising a constitutional right, then notions of fair play and the need to preserve the truth-testing functions of the adversarial process may outweigh the defendant's interest in suppressing the evidence." *Id.* at 584. However, as *Coulthard* also states, in cases in which "exercising one's privilege to be free from warrantless searches is simply not probative (or has low probative value) to a determination of guilt, [ ] the defendant's right to not be penalized for exercising such privilege is paramount." *Id.* In this case, the constitutional right is different, but the analysis is the same. Anthony's attorney's action of filing a motion to suppress eye witness identification simply is not probative to a determination of

---

8 *See Coulthard*, 230 S.W.3d at 583 ("Once Appellant submitted himself to cross-examination after claiming self defense at trial, it was not only appropriate but necessary for the Commonwealth to impeach Appellant's credibility and rebut his allegations.") (citing *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980)); *Hayton v. Commonwealth*, 332 S.W.2d 537, 538 (Ky. 1960) ("When a defendant in a criminal prosecution takes the stand as a witness in his own behalf, he may be cross-examined as fully and freely as any other witness.") (citations omitted).

30

Anthony's guilt, and therefore, the evidence of the filing of that motion is being used to penalize him for exercising a constitutional right and is inadmissible.

### C. The trial court's error in allowing cross-examination on the filing of the motion to suppress is harmless beyond a reasonable doubt.

Simply put, the filing of the pretrial motion to suppress is irrelevant for impeachment purposes and has little substantive value. Accordingly, I must conclude that the trial court erred in permitting cross-examination on the filing of that pretrial motion. However, I find that error to be harmless beyond a reasonable doubt.[9] There is no reasonable probability that the Commonwealth's cross-examination on the motion to suppress contributed to the jury's verdict. Rather, the jury heard from eye-witnesses and also heard the defendant's phone calls made from jail. Perhaps more importantly, the jury heard Anthony's prior statements to police in which he claimed he was not present at the shooting and his conflicting testimony at trial in which he

---

[9] This analysis reflects the "harmless beyond a reasonable doubt" standard applied to constitutional errors. *See Ordway v. Commonwealth*, 391 S.W.3d 762, 774 (Ky. 2013) (citation omitted). The *Coulthard* decision suggests that this is the appropriate standard when a defendant has been penalized for exercising a constitutional right. *Coulthard*, 230 S.W.3d at 584; *see also Blake v. Commonwealth*, 646 S.W.2d 718, 719 (Ky. 1983) (finding that prosecutor's commentary on defendant's silence was harmless beyond a reasonable doubt). Other jurisdictions also characterize such errors as constitutional, thereby requiring that the error be found harmless beyond a reasonable doubt. *See United States v. Runyan*, 290 F.3d 223, 250 (5th Cir. 2002) ("This court ordinarily analyzes due process claims alleging improper comment on a defendant's invocation of constitutional rights under the harmless error doctrine, determining whether the improper comment was harmless beyond a reasonable doubt." (citations omitted)); *Bosse v. State*, 400 P.3d 834, 851 (Okla. Crim. App. 2017) (finding similar error harmless beyond a reasonable doubt); *People v. Perry*, 68 P.3d 472, 476 (Colo. App. 2002) (same); *Gomez v. State*, 572 So.2d 952, 953 (Fla.Dist.Ct.App. 1990) (referring to similar error as "constitutional error" and remanding for new trial because error not harmless beyond a reasonable doubt).

claimed self-defense. Furthermore, the Commonwealth did not expressly mention the motion to suppress in closing, nor did it need to; it was cumulative in light of the other evidence that discredited Anthony's shifting defenses and proved his guilt. Thus, even without the cross-examination on the motion to suppress, the guilty verdict was supported by overwhelming evidence. Accordingly, while I believe that the trial court erred in allowing cross-examination on the filing of that motion, I find that error to be harmless beyond a reasonable doubt.

## III. CONCLUSION

For the reasons set forth above, I would find that the trial court erred in allowing the prosecution to cross examine Anthony on the filing of the motion to suppress, but I would also find that error to be harmless. Nevertheless, I feel compelled to note the potential and significant impact of the majority's decision. It should be noted that the majority's holding on this issue will not be limited to criminal cases. In almost every civil case, a party testifies after having moved through their attorney, to exclude certain evidence. If they have been unsuccessful in their attempt to exclude *any* of the evidence, then this circumstance will become fodder for cross-examination. Likewise, if we permit or condone the attempted or successful "impeachment" of a defendant with his defense counsel's filing of a motion to suppress, we punish that defendant for the tactical decisions of his attorney and penalize him for attempting to enforce his constitutionally-guaranteed rights. We also place an impossible burden on defense counsel, who must either forgo an attack on potentially infirm evidence

32

or attempt to suppress such evidence by filing a motion to suppress, thereby setting their client up for impeachment. Thus, today the majority not only prejudices the individual defendant but also creates an unacceptable chilling effect that will limit future defendants' ability to enforce their rights without punishment, which, in effect, deprives them of those rights.

Lambert and Wright, JJ., join.

COUNSEL FOR APPELLANT:

Daniel T. Goyette
Louisville Metro Public Defender's Office

Cicely Jaracz Lambert
Louisville Metro Public Defender's Office

Leo Gerard Smith
Louisville Metro Public Defender's Office

Joshua Michael Reho
Louisville Metro Public Defender's Office

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General